**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

KEVIN KENT,

           Plaintiff,

     v.

GARDEN CITY, GEORGIA; and GILBERT
C. BALLARD, in his Official Capacity as
Chief of Police for the Garden City Police
Department,

           Defendants.

CIVIL ACTION NO.: 4:23-cv-307

**O R D E R**

Plaintiff Kevin D. Kent, Sr., sued Defendants Garden City, Georgia (the "City"), and

Gilbert C. Ballard, in his official capacity as Chief of Police of the Garden City Police Department

(the "Department"), under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

("ADA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Family

and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA").  (Doc. 1.)  Plaintiff's suit alleges

that Defendants discriminated and retaliated against him because of his perceived disability, and

because he engaged in conduct protected by Title VII and the FMLA.  (Id.)  Presently before the

Court is Defendants' Motion for Summary Judgment, (doc. 17), in which they argue, among other

things, that Plaintiff has failed to raise a genuine issue of material fact on any of his claims because

neither his status, nor any of his conduct, was protected under the ADA, Title VII, or the FMLA;

and because Defendants had legitimate reasons for terminating Plaintiff's employment, (doc. 19).

Plaintiff filed a Response, (doc. 23), and Defendants filed a Reply, (doc. 26).  For the reasons

below, the Court **GRANTS** Defendants' Motion for Summary Judgment.  (Doc. 17.)

# BACKGROUND

## I.    Factual Background

Plaintiff Kevin Kent worked for the Department from 2010 to May 2022.  (Doc. 24, p. 1.)  During his employment, Plaintiff held the rank of police officer for roughly the first eight years, and Advanced Police Officer ("APO") for roughly the final four years.  (Id.)  In his roles as a police officer and an APO, Plaintiff's primary duties were to "patrol[] a specific geographical area to deter crime, respond to calls for service, conduct various investigations, and assist people with special needs."  (Id. at pp. 24–25.)  The Department's job description for these positions specifies that officers must have "[s]ufficient strength, vision, stamina and agility" to meet the physical demands of the job, which include "some walking and standing with intermittent stooping, bending and crouching, and occasional strenuous activity (running and fighting) . . . . [and] occasional lifting of light and heavy objects and the use of equipment that requires dexterity."  (Id.)  The parties also agree that "the ability to kneel or to stand up from a kneeling position is an essential duty of a Garden City police officer, and the ability to stand up unassisted from a kneeling position is an essential duty."  (Id. at p. 25.)

Between August 2020 and March 2022, Plaintiff suffered two separate off-the-job injuries and went on two corresponding periods of medical leave protected by the FMLA.  (Id. at pp. 1–2.)  Plaintiff first took FMLA leave from August 19, 2020, to January 20, 2021, because of a "wrist surgery unrelated to his employment."  (Id.)  Then, on December 26, 2021, Plaintiff "tore his left leg quadriceps tendon, going down stairs at his home."  (Id. at p. 2.)  Plaintiff again went on FMLA leave, during which time Dr. Spencer Wheeler performed surgery on him to repair the torn tendon.  (Id.)  After Dr. Wheeler released Plaintiff to return to work, Plaintiff returned to his APO role on March 23, 2022.  (Id.)

### A.    The Chief Ballard Meeting

Since at least 2021, Plaintiff had expressed interest in obtaining a promotion from APO to corporal.  (Id. at pp. 25–26.)  To be considered for a corporal position, the Department required applicants to pass a qualification test, which it administered each time an open corporal position became available.  (Id.)  Plaintiff, upon returning from his second FMLA leave on March 23, 2022, was aware that a new corporal position with the Department would become available in June 2022, and that the Department would administer its qualification test for this position on June 6.  (Id.)

According to Plaintiff, the upcoming corporal position was a topic of discussion when he and Defendant Chief Gilbert Ballard met for Plaintiff's annual performance review shortly after Plaintiff's March 23 return.  (Doc. 1, p. 6.)  Plaintiff claims that, during this meeting, Ballard informed him that "he was not going to promote [Plaintiff] for the upcoming [corporal] promotion on June 7, 2022 [due to Plaintiff] being out with FMLA twice in two years."  (Doc. 24, p. 26.)  Plaintiff alleges that, in that same meeting, he responded by "complain[ing] to Chief Ballard that he was being retaliated against for taking protected FMLA leave and he felt as though his medical history and surgeries were being used against him as a reason for him not to be promoted."  (Doc. 1, p. 6.)  Ballard, however, later testified that he "does not believe this conversation ever happened."  (Doc. 24, p. 26.)

### B.    Plaintiff's Physical Abilities upon Returning from FMLA Leave

Before Plaintiff's March 23, 2022, return, both Dr. Wheeler and a separate doctor—who, according to Plaintiff, the City required Plaintiff to visit for physical evaluation—released him to return to work.  (Id. at p. 2; doc. 23, p. 4.)  Plaintiff thereafter worked as an APO from the date of his return until on or shortly after May 19, 2022.  (Doc. 24, p. 23.)  Plaintiff maintains that, during this time, "he was not experiencing any problems relating to the injury to his quadriceps tendon,

and he was able to perform all the duties of a Garden City police officer." (<u>Id.</u> at p. 2; <u>see also</u> <u>id.</u> at pp. 23–24.)

Defendants, on the other hand, claim that Plaintiff exhibited clear signs of physical distress and immobility stemming from his quadricep injury from the time of his March 23 return until his eventual termination. (<u>Id.</u> at pp. 3–23.) Deposition testimony from Plaintiff's then-colleagues recounts their concerns for Plaintiff's physical capabilities in the weeks after he returned to work. (<u>Id.</u>) For instance, Lieutenant Shawn Myers testified that, upon riding patrol with Plaintiff and observing him shortly after his return, Myers felt compelled to inform Chief Ballard that Plaintiff "does not need to be on the street" because "he cannot move. He cannot hardly function. He has mobility issues." (<u>Id.</u> at p. 3.) Myers further recalled a "prime example" of Plaintiff's immobility when, during an active shooter incident, Plaintiff supposedly dropped his shotgun and could not bend over to pick it up and another officer had to pick up the weapon for him. (<u>Id.</u> at pp. 3–4.)

Sergeant Shane Glasco also testified that, during April 2022 virtual-simulation drills, he observed that Plaintiff "was unable to assume a kneeling position without obvious difficulty" requiring Glasco to "physically assist [Plaintiff] with getting back to his feet." (<u>Id.</u> at p. 5.) About a month after observing Plaintiff's simulation-drill performances, Glasco wrote the following in his annual evaluation of Plaintiff, dated May 17, 2022:

> Over the course of the last year [Plaintiff] has experienced some physical ailments that have affected his ability to perform the required tasks of his position. He has been in recovery, but has not regained full function to be able to kneel which limits his effectiveness in various and potentially critical situations.

(<u>Id.</u> at p. 8.) Glasco's evaluation nevertheless concluded that, "[o]verall," Plaintiff "met the requirements of the job" because, "for the entire period of the year, he was performing in an acceptable manner." (<u>Id.</u> at p. 9.)

Plaintiff describes these events differently.  As to Myers's account of the active-shooter

incident, Plaintiff testified that "he did not drop his weapon, nor did anyone have to pick up said

weapon."  (Id. at pp. 4–5.)  Similarly, in response to Glasco's statements on the virtual simulations,

Plaintiff testified that, "during the simulation exercises, he was able to go down to one knee, and,

subsequently, get up on his own."  (Id. at pp. 5–9.)  While Plaintiff did testify that he "had limits"

after his March 23 return, he maintained that he was "not experiencing any problems relating to

the injury to his quadriceps tendon, and he was able to perform all the duties of a Garden City

police officer, and he was able to go down to a kneeling position and then stand back up

unassisted."  (Id. at pp. 8–9.)

### C.    Qualification Day

Plaintiff had "range qualification requirements" as a police officer.  (Id. at p. 5.)  Lieutenant

Myers testified that, to meet these requirements, officers were annually required to complete a

"course of fire" that he described as follows:

> [O]ne part of the relay is officers have to fire . . . multiple shots on different targets
> and then transition to . . . where they reload their gun, put a new mag in, chamber a
> round and then drop down to their knee and . . . do some more shooting from the
> knee position.

(Id. at pp. 9–10.)  On May 19, 2022, roughly two months after Plaintiff's March 23 return, the

Department administered its annual "range qualification day."  (Id. at p. 9.)  Sergeant David Dess

was the "range master," and Ballard, Myers, and Captain Joseph Papp were also present.  (Id. at

pp. 9–11, 13.)

Myers observed Plaintiff's initial attempt at completing the course of fire and described it

in the following deposition testimony:

> When he was trying to do the reload, you can tell he had difficulty trying to
> manipulate . . . . his left hand that's fused if I recall right.  So that hand can open
> and close, but he can't like, manipulate the wrist . . . . It took . . . [Plaintiff] some
> time [to reload] . . . . And then when he went to drop down to do the knee position

> . . . . it seem[ed] like when he bends down, he has to twist or turn into a certain
> situation . . . maybe [to get] his knees or something lined up in a certain way . . . .
> [T]here were people on each side of him, and he was, you know, generally trying
> to, like, very slowly get down on his knees, but he was twisting as he did it . . . .
> [and he] fell. And as he did so, he pointed the gun at an officer that was standing
> beside him and . . . somehow the gun fell out of his hand and he fell forward and
> landed on his hands and knees . . . . [P]eople were still shooting on each side of him
> . . . . [s]o we yelled cease fire . . . . Dess had to come over and help him get up . . .
> . And we finally got him up . . . . [And] we took him off the range right then.

(Id. at pp. 9–10.) Captain Papp also observed Plaintiff's first attempt and stated during his

deposition that,

> I observed [Plaintiff] . . . on the ground. He was wincing. His face was wincing.
> He was grunting. He appeared to be in pain . . . . His firearm was on the ground
> loaded with live ammunition . . . . [a]nd the barrel of the gun was pointing towards
> myself and the other officers . . .

(Id. at p. 11.) Plaintiff was allowed to attempt the course of fire a second time. (Id. at pp. 9–10,

13.) Myers testified that most of the other officers present cleared the course of fire for this second

attempt because, after observing Plaintiff's initial performance, "nobody wanted to go out there."

(Id. at p. 10.) Sergeant Dess described Plaintiff's second course-of-fire attempt with the following

testimony:

> [Plaintiff] [s]hot the 25 yard line fine. [He then] [m]oved up to the 15 yard line
> [and] . . . . [s]hot the first two rounds standing . . . . [but] when he attempted to go
> down to a knee, he was having difficulty doing so. It took him several seconds to
> get into the kneeling position. By then, the 12 second time had elapsed. The 12
> second time is [not] my time. It's not the Garden City Police Department's time.
> We use the State qualification course that's approved by the Georgia Public
> Training Center and the Georgia POST Council . . . . Once he was able to get down
> into a kneeling position, he fired the other two shots. He was unable to stand up on
> his own. I observed that he was visibly shaking. His body was shaking and he had
> body tremors and his arms were shaking. He still had not gone back to the holster
> yet. I was trying to get him to return to the holster, giving him commands to return
> to the holster . . . . [H]e was trying to put the weapon back into the holster, and the
> weapon was pointing back towards the officers that was sitting behind us at the
> loading area, which was roughly about 50 yards behind us. I told him to watch his
> muzzle awareness again. He was able to kind of lean to the left a little bit, and put
> the gun back into the holster. Once he did that, he was unable to stand up on his
> own power. He was having difficulty doing so and I moved in to assist him getting
> back up to a standing position. Once he was back up . . . . we continued the rest of

the course of fire . . . . I scored the target.  He did obtain a score of 91[.]  However,
at the 15 yard line, he did not meet the time requirements that is established by the
Georgia POST Council and the Georgia Public Safety Training Center as our course
of fire requirements.

(Id. at p. 13.)  Ballard recorded a video of the 15-yard-line portion of Plaintiff's second attempt.

(Id. at p. 14.)

Plaintiff denies certain aspects of the testimony regarding qualification day and again

maintains that, during the course of fire, "he was not experiencing any problems relating to the

injury to his quadriceps tendon."  (Id. at p. 11.)  Plaintiff testified that, though it was not "easy"

for him to assume a kneeling position during qualification day, he "would not say he had difficulty"

doing so.  (Id.)  Regarding Myers' testimony that "Dess had to come over and help [Plaintiff] get

up" during his first attempt, Plaintiff stated that "he could have gotten up by himself with enough

time."  (Id. at p. 10.)  Plaintiff also testified that his weapon was not pointed at another officer

during the first attempt at qualification.  (Id. at p. 11.)  Concerning the second attempt, Plaintiff

again testified that "he could have gotten up by himself with enough time."  (Id. at p. 13.)

Nevertheless, Plaintiff admits that "the 12 second time limit elapsed before [he] stopped firing at

the 15 yard line," and that that "by his second time at qualification at the range on May 19, 2022,

some officers had seen him being picked up at least once if not more than once."  (Id. at p. 14.)

### D.    Termination

Sergeant Dess testified that after Plaintiff's qualification day performance he spoke to

Lieutenant Myers and informed Myers that he "did not believe [Plaintiff] was fit for duty."  (Id. at

p. 15.)  Dess further testified that he and Myers discussed that, given how Plaintiff was "not able

to stand up, and just the way he was manipulating the firearm" during the course of fire, "it did not

appear [Plaintiff] was able to perform the basic functions of what an officer would be expected to

perform, had they had the need to quickly move, get into a kneeling position, quickly reload a

handgun, or any kind of high-stress situation that would require the body to be physical." (Id.)

Dess documented his concern in a written memo dated on qualification day, May 19, 2022. (Id. at pp. 15–16.) The memo, addressed to Captain Papp and copying Chief Ballard, states:

> Although [Plaintiff] was able to perform the course of fire with a passing score; he did not meet the twelve second time requirement at the 15 yard-line. The course of fire is a static controlled environment. Officers are not placed under any stress other than being tasked with firing the course of fire, as instructed, in the allotted time allowed by the state approved course of fire. After observing [Plaintiff]'s mobility issues on this date, I do not believe he is currently fit for duty. I fear if he was knocked down in an altercation while working the streets, he would be unable to stand back up on his own to defend himself or others. Furthermore, if he was engaging by a hostile subject shooting at him, I do not believe he would be able to quickly and safely move to a position of cover to keep himself safe.

(Id.) Myers also drafted a May 19 memo, in which he wrote,

> I have great concerns for [Plaintiff's] physical ability and believe he is not physically fit to perform physical duties that are required on the street. His lack of physical ability puts himself and other officers at a disadvantage if either were engaged in a physical encounter with a subject. These concerns include his leg mobility needed for movement. I'm also concerned with his hand mobility, which is needed to manipulate the firearms' slide and magazine release and more importantly the hand mobility and strength to retain the weapon.

(Id. at pp. 17–18.) Papp in turn drafted his own memo, dated May 23, 2022, which stated,

> I believe [Plaintiff]'s decisions to attempt the duties of a uniformed patrolman is poor conduct and unacceptable performance issues. [Plaintiff] is providing information he is fit for duty, when in fact he is not. [Plaintiff] is lacking the ability to safely do his job, which is gravely affecting his abilities as a police officer, while severely compromising the safety of his fellow officers, the public he serves, and himself. I would not recommend he continues as a police officer with our department, as to allow him would be a detrimental risk. I believe as [Plaintiff] attempts to work in the capacities as a police officer with us, he is violating [several Department] policies . . .

(Id. at pp. 19–20.) Papp's memo then lists six specific Department policies that he believed

Plaintiff violated. (Id.)

Chief Ballard subsequently terminated Plaintiff's employment effective May 25, 2022.  (Id. at pp. 20–21.)  In a letter to Plaintiff that incorporates Dess, Myers, and Papp's memos, Ballard provided Plaintiff with the following reasons for the termination:

> I have received and reviewed documentation from Sgt. David Dess, Lt. Shawn Myers and Captain Joseph Papp regarding your performance on 5/19/22.  I also witnessed your inability to perform at the required police officer standard(s) on 5/19/22.  Your actions revealed you are not fit for duty.  You are unable to meet or maintain our current minimum qualifications regarding the position of police officer, which include Section 2-5.9(J) Physical Demands and (N) Minimum Qualifications.  Your actions have been classified as violations of our Standard Operation Policies and Standards; Section 2.8.2 Code of Ethics, 2-8.3 Code of Conduct (A)(4)(Duty Regarding Conduct, (A)(7) Duty Not to Give False or Misleading Information, (A)(20) Illness/Condition (Physical/Mental) Sick Leave, (A)(3) Prompt Performance of Duty/Neglect OF Duty.  This is written notice you are hereby terminated from employment with the City of Garden City on 5/25/22.

(Id. at p. 21.)  Ballard later testified regarding the termination and policy violations,

> [T]here were concerns that, for me, he came back too soon.  I believe he knows that.  In essence, we were trying to give him the opportunity, trying to be right by him [so] . . . . [w]e allowed this to carry on with my concerns, heard informally about concerns.  We're in a position where two doctors have said he's okay, but I don't know what their testing requirements are . . . . So as this goes on, when you have the culmination of when we get to the range, we're trying to give them the benefit of the doubt.  The range is going to be telltale . . . . And then when we saw what we saw, it was apparent.  He was not physically fit.  And my concerns go on not only that, but in these list [sic] policies . . . . So I could see he physically couldn't do what needed to be done at the range, and so I had made the decision at that point.  We were fortunate that nothing had happened while he was on the street that would endanger himself or anyone else.

(Id. at p. 22.)

When Plaintiff was asked in his deposition whether he had any reason to doubt that Sergeant Dess truly believed, as written in his memo, that Plaintiff was unfit for duty after observing him on qualification day, Plaintiff stated, "I can't testify on what [Dess] thought.  I don't know."  (Id. at p. 16; see also doc. 24-1, p. 63.)  Plaintiff does not think Dess had anything against him personally.  (Doc. 24, p. 17.)  Regarding Lieutenant Myers' assertion in his memo that he believed Plaintiff was physically unfit to be a police officer, Plaintiff testified that he did not know

whether there was a reason to think Myers did not honestly hold this belief.  (Id. at pp. 18–19; see also doc. 24-1, p. 71.)  Plaintiff was also asked whether Myers, "having witnessed what [Myers] witnessed on May 19th," could "honestly walk away with" the opinion that Plaintiff's "lack of physical ability puts himself and other officers at a disadvantage if either were engaged in a physical encounter with a subject." (Doc. 24, p. 19; see also 24-1, pp. 71–72.)  Plaintiff responded, "[y]es, if it's his opinion, yes.  That's his opinion, yes." (Doc. 24-1, p. 72; see also doc. 24, p. 19.)  Lastly, regarding Papp's May 23 memo, when asked whether he had "any reason to think that Captain Papp did not honestly hold th[e] belief[s]" expressed in the memo, Plaintiff stated, "I believe that that's what he felt . . . . That's just his speculation." (Doc. 24-1, p. 74.)

## II.    Procedural History

Plaintiff filed suit against the City and against Chief Ballard, in his official capacity as Chief of Police for the Department, on October 18, 2023.  (Doc. 1.)  Plaintiff alleges claims for discrimination in violation of the ADA, (Count I), and for retaliation in violation of Title VII and the FMLA, (Counts II–III).  (Id. at pp. 9–14.)  Plaintiff also seeks a declaratory judgment that Defendants engaged in unlawful employment practices, as well as punitive damages and attorney's fees.  (Id. at pp. 14–15.)  Defendants filed the at-issue Motion for Summary Judgment arguing, among other things, that Plaintiff is not a "qualified individual" under the ADA, and that Defendants terminated Plaintiff for a legitimate reason—they believed he was physically unfit to be a police officer.  (See generally docs. 17, 19.)  Plaintiff filed a Response, (docs. 23, 24), and Defendants filed a Reply, (doc. 26).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  The moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I. ADA Discrimination

The ADA provides that no covered entity, including employers, "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For an ADA employment claim to survive summary judgment, the employee must show—by citing "either direct or circumstantial evidence of discrimination"—that a reasonable jury could find that the employer violated the statute. Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1214–15 (11th Cir. 2021) (quoting Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001)). When an employee offers purely circumstantial evidence of discrimination, as Plaintiff does here,[1] the employee can defeat summary judgment by one of two methods. First, the employee can demonstrate a genuine issue of fact exists whether an ADA violation occurred by satisfying the "McDonnell Douglas burden shifting framework." Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019). Alternatively, the employee can present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Id. (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir.

---

[1] In his Response to Defendants' Motion for Summary Judgment, Plaintiff acknowledges that his ADA discrimination claim relies on circumstantial, not direct, evidence: "Here, [Plaintiff] establishes via circumstantial evidence that Defendants discriminated against him due to his disability." (Doc. 23, p. 2.)

2011)).    Here, Plaintiff argues that he has presented enough circumstantial evidence of discrimination for his claim to survive summary judgment under either McDonnell Douglas or the "convincing mosaic" framework.  (Doc. 23, pp. 2–11, 14–16.)  The Court addresses each argument in turn and, finding the claim fails under both standards, **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's ADA discrimination claim (Count I).

### A.    McDonnell Douglas Framework

To evaluate an employee's circumstantial-evidence ADA claim at the summary judgment stage, the Eleventh Circuit Court of Appeals has adopted the three-step, burden-shifting framework that the Supreme Court first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Todd, 998 F.3d at 1215.  At the first step, the employee must "establish a prima facie case of disability discrimination using circumstantial evidence."  Akridge v. Alfa Ins. Cos., 93 F.4th 1181, 1191 (11th Cir. 2024) (citing Todd, 998 F.3d at 1215).  Second, "[i]f the employee is successful in making a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision."  Id.  (citing Todd, 998 F.3d at 1216).  Third, if the employer provides a legitimate reason, "[t]he burden then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination."  Id.

Courts in the Eleventh Circuit "may assume without deciding that the plaintiff has established a *prima facie* case and decide the case on the question of pretext" when "the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action."  Thomas v. Dolgencorp, LLC, 645 F. App'x 948, 951 (11th Cir. 2016).  This approach is appropriate here. Assuming without deciding that Plaintiff has established a *prima facie* case, his ADA discrimination claim still fails under McDonnell Douglas because Defendants have articulated

legitimate reasons for terminating Plaintiff, and Plaintiff has not presented sufficient evidence that these reasons are pretext for discrimination.

### 1. Defendants' Legitimate, Non-discriminatory Reason for Terminating Plaintiff

Assuming that Plaintiff established a *prima facie* ADA case, the burden shifts to Defendants to "articulate a legitimate, non-discriminatory reason for [their] decision" to terminate him. Akridge, 93 F.4th at 1191 (citing Todd, 998 F.3d at 1216). Employers can satisfy this burden by offering enough evidence to raise a genuine dispute of fact that they terminated the employee for legally sufficient reasons other than the employee's perceived status as disabled. See Kragor v. Takeda Pharms. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012); Walker v. Mortham, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting Tex. Dep't. Cmty. Affs. v. Burdine, 450 U.S. 248, 255 (1981)). The Eleventh Circuit has described this burden as "exceedingly light." Duckworth v. Pilgrim's Pride Corp., 764 F. App'x. 850, 853 (11th Cir. 2019) (quoting Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983)). Employers, indeed, can identify any rationale for a challenged termination that "might motivate a reasonable employer." Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030–31 (11th Cir. 2000)). Moreover, the employer "need not persuade the court that it was actually motivated by the proffered reasons." Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004)). Rather, to meet its "legitimate reason" burden, the employer need only "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. 257). The Court finds Defendants have met this burden here.

The record contains considerable evidence suggesting Defendants had legitimate, non-discriminatory reasons to fire Plaintiff. One piece of evidence setting forth these reasons is Captain

Papp's May 23, 2022, memo that recommended Plaintiff's termination.  (Doc. 24, p. 19–20.)  Papp wrote that he believed Plaintiff lacked the physical ability to safely work as a police officer and that, by returning to work when he was not fit for duty, Plaintiff violated Defendants' policies prohibiting, among other things, "false or misleading information."   (Doc. 24, pp. 19–23.) Numerous other, similar pieces of evidence likewise indicate that Defendants terminated Plaintiff because they believed he was physically unable to perform as a police officer, and that he had violated Department policy by returning to duty in his limited state—not because of discriminatory animus.   (See, e.g., doc. 24, p. 15 (Sergeant Dess deposition testimony); id. at pp. 17–19 (Lieutenant Myers memo); id. at p. 21 (Chief Ballard termination letter); id. at p. 22 (Chief Ballard deposition testimony).)  This satisfies Defendants' "light" burden.  Duckworth, 764 F. App'x. at 853 (quoting Perryman, 698 F.2d at 1142).

An employee's inability to do their job is quintessentially a legitimate and non-discriminatory reason for terminating them.  See, e.g., Roddy v. City of Villa Rica, 536 F. App'x 995, 1001–03 (11th Cir. 2013) (physical inability to perform duties legitimate reason to fire police officer); Walls v. Lee Mem'l Health Sys., No. 2:23-cv-150, 2025 WL 254826, at *15 (M.D. Fla. Jan. 21, 2025) (physical inability to perform job duties legitimate reason to terminate employee). Such an inability to perform, moreover, remains a legitimate reason for ending a person's employment even if their limitations arise from a perceived disability.  In Todd v. Fayette County School District, for instance, a teacher's coworkers reported that the teacher had threatened to kill a student and the school declined to renew her contract, finding the alleged threats showed she was unable to be an effective teacher.  998 F.3d at 1209–10.  The Eleventh Circuit held the school's reasons were legitimate and nondiscriminatory, even though "the threats [the teacher] allegedly made[] likely stemmed from her [ADA-protected] major depressive disorder."  Id.  The record, the

court observed, did not suggest the school declined the teacher's contract "because she had been diagnosed with major depressive disorder." Id.  Rather, the reason for her nonrenewal was that the school "believed she made threats" that demonstrated she was unfit to care for students.  Id.  The school accordingly "acted within its rights" in ending her employment for that reason.  Id.; see also Handley v. CSX Transp., Inc., No. 2:22-cv-690, 2024 WL 4394750, at *6 (M.D. Ala. Oct. 3, 2024) ("Even if the behaviors found by CSX to warrant suspension were related to Handley's [ADA-protected] Tourette's, it does not make the proffered reasons illegitimate.").

Here, Plaintiff's physical inability to perform his duties, as well as the determination that he had violated related Department policies, are both acceptable grounds for firing him under the ADA.  These reasons, furthermore, remain legitimate even if Plaintiff's physical limitations stemmed from his perceived disability.  Indeed, as in Todd, Defendants here claim that they terminated Plaintiff because they thought he was unfit to serve, not because Defendants harbored discriminatory animus toward Plaintiff because of his torn quadricep diagnosis.  Evidence that Plaintiff was unfit "might motivate a reasonable employer" to fire him.  See Duckworth, 764 F. App'x at 853.  At this stage, where the Court is not concerned with what "actually motivated" the employer, Defendants have met their burden of identifying a legitimate, non-discriminatory reason for terminating Plaintiff.  Id.

### 2.   Pretext

Because Defendants have presented legitimate, non-discriminatory reasons for terminating Plaintiff, Plaintiff must show that those reasons were not the true reasons for his termination but were "mere pretext for discrimination based on [his] disability." Todd, 998 F.3d at 1217–18 (citing Alvarez v. Royal Atl. Devs. Inc., 610 F.3d 1253, 1265 (11th Cir. 2010)).  To show pretext, employees must create a factual dispute regarding "*both* [whether] the reason was false, *and*

[whether] discrimination was the real reason." <u>Akridge</u>, 93 F.4th at 1196 (quoting <u>Ring v. Boca Ciega Yacht Club Inc.</u>, 4 F.4th 1149, 1163 (11th Cir. 2021)).

First, employees can show a proffered reason is false by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason for the employment action that a reasonable factfinder could find them unworthy of credence." <u>Thomas</u>, 645 F. App'x at 951 (citing <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1348 (11th Cir. 2007)). Because the employer's motivation is the sole concern at this stage, the falsity inquiry "centers on the employer's beliefs," and not the "truth" of those beliefs in "reality as it exists outside of the [employer's] head." <u>Todd</u>, 998 F.3d at 1218; <u>see also id.</u> ("[A]t the pretext stage of the inquiry, we are unconcerned with the truth of the allegations that led to [the plaintiff]'s termination."); <u>Johnson v. Miami-Dade Cnty.</u>, 948 F.3d 1318, 1329 (11th Cir. 2020) (employer may fire employee based on erroneous facts). To show falsity, employees therefore must identify sufficient evidence to suggest their employer "did not honestly believe" their claimed reasons for the termination. <u>Todd</u>, 998 F.3d at 1218.

Second, the employee must show that "discrimination was the real reason" for their termination. <u>Akridge</u>, 93 F.4th at 1196. "A finding that [an employer's] proffered reason is false does not compel an inference of discrimination." <u>Thomas</u>, 645 F. App'x at 951. Rather, "because the burden of proving discriminatory intent remains at all times with the plaintiff," the plaintiff-employee must point to at least some evidence suggesting their employer acted with discriminatory animus to establish pretext. <u>Id.</u> (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993)).

Here, Plaintiff attempts to demonstrate that Defendants' stated reasons for terminating him are false by arguing that some of Defendants' actions are inconsistent with an honest belief that he was physically unfit for his job. (Doc. 23, pp. 9–10.) Plaintiff highlights that, though Defendants

17

were supposedly concerned that Plaintiff's knee was not healed upon his March 23, 2022, return, they did not "engage in the interactive process to determine whether an accommodation was appropriate for [Plaintiff]." (Id. at p. 9.) Instead, Plaintiff points out, Defendants allowed him to participate in "simulations, qualification exercises, and active-duty situations" in the weeks between March 23 and the May 25 termination. (Id. at p. 10.) Moreover, Plaintiff claims, Defendants' limited investigation into Plaintiff's physical abilities only yielded results that reinforced Plaintiff's ability to perform. (Id. at p. 9.) The opinion that Ballard requested from a police-department doctor, for instance, concurred with that of Plaintiff's doctor and released him to work. (Id.) And, despite Plaintiff's allegedly deficient performance during the April 18 active-shooter incident, during which he allegedly dropped his weapon and could not bend to retrieve it, Defendants "did not investigate[,] . . . discipline or reprimand [him]." (Id. at p. 10; see also doc. 24, pp. 3–4.) Considering these facts, Plaintiff argues, Defendants' "supposed 'concerns' regarding [Plaintiff's] physical mobility were not true." (Id. at pp. 9–10.) Defendants respond by maintaining, among other things, that Plaintiff's pretext arguments do not address the main piece of evidence supporting their proffered reasons for terminating him: "the May 19, 2022 [events] at the range." (Doc. 26, pp. 5, 7.)

The Court agrees with Defendants and finds Plaintiff has failed to create a factual dispute that the proffered reasons for terminating him were false, or that the real reason was disability discrimination. Courts considering pretext "'do not sit as a super-personnel department that reexamines an entity's business decisions,' and [they] may not 'analyze whether an employer's proffered reasons are prudent or fair.'" Akridge, 93 F.4th at 1195 (quoting Owens v. Governor's Off. of Student Achievement, 52 F.4th 1327, 1338 (11th Cir. 2022)). Accordingly, an employer's proffered reason for termination is not "false" merely because the employer could have acted more

18

reasonably under the circumstances.  The fact that Defendants kept Plaintiff employed for a few weeks after his March 23, 2022, return therefore does not preclude Defendants from eventually terminating Plaintiff for his physical shortcomings.  See, e.g., Todd, 998 F.3d at 1218 ("That the District first sought to find a way for Todd to return to work without endangering the safety of students and staff did not preclude the District from later deciding not to renew her contract because it considered her past misconduct to be disqualifying.").

Here, Defendants' conduct in the weeks following Plaintiff's return is not inconsistent with a belief that Plaintiff lacked the physical capabilities necessary to remain a police officer.  Even if Defendants could have investigated and acted on their purported suspicions in a more decisive manner, or engaged Plaintiff in an interactive process, their supposed failure to do so does not create a factual dispute as to whether their proffered reasons for termination were false.

Moreover, Plaintiff does nothing to rebut the most convincing indicator that Defendants truly believed their proffered reason for terminating him: his qualification-day performance on May 19.  The record establishes that the impression Plaintiff left that day led Defendants to conclude his physical limitations required his termination.  Defendants, indeed, began the process for terminating Plaintiff immediately upon observing his May 19 performance[2] and effected the termination shortly thereafter on May 25.  (Doc. 24, pp. 15–21.)  Particularly considering the safety risks Plaintiff posed to his fellow officers in this testing scenario—much less the threats he would have posed to them and the public were his performance replicated in the field—it is entirely understandable that his superiors sought his termination.  Importantly—far from disputing the notion that qualification day caused Defendants to believe Plaintiff was unfit for service—the

---

[2] Two superior officers who witnessed Plaintiff on May 19—Sergeant Dess and Lieutenant Myers—drafted memos dated that same day documenting their belief that, based on Plaintiff's performance, he was physically unfit for the job.  (See doc. 24, pp. 15–19.)

record contains considerable evidence indicating Plaintiff *agrees* that, on account of his May 19 performance, Defendants truly thought his physical state required his termination.  Plaintiff, for instance, conceded during deposition that his qualification day performance could have caused Defendants to "honestly walk away with" the belief that his "lack of physical ability put[] himself and other officers at a disadvantage." (Doc. 17-1, pp. 26–27.)  When Plaintiff was asked, regarding Papp's May 23 memo, whether Plaintiff had "any reason to think that Captain Papp did not honestly hold th[e] belief" that Plaintiff's physical limitations necessitated his termination, Plaintiff responded, "I believe that that's what [Papp] felt." (Doc. 24-1, p. 74; see also doc. 17-2, pp. 42–43.)  Accordingly, even though Plaintiff disputes his *actual* abilities, there is no material dispute regarding what Defendants *perceived* after observing Plaintiff on qualification day. Indeed, all the evidence Plaintiff offers to show pretext—the early-stage investigation, the doctors' notes, the lack of an interactive process—only bear on Defendants' beliefs *before* qualification day.  See Todd, 998 F.3d at 1219 (proffered reason was non-pretext in part because "Todd engaged in some behavior that led to the District's nonrenewal decision *after* Lakeview and Dr. Weigand approved her return to work").  Plaintiff accordingly has not presented sufficient evidence to show Defendants "did not honestly believe" their proffered reasons for the termination.  Id. at 1218.

Finally, even if there were a dispute as to whether Defendants' stated reasons were false, Plaintiff has not identified any evidence suggesting that the *real* reason Defendants terminated him was to discriminate against him based on his perceived disability.  The only alternative rationale Plaintiff offers for his termination is his claim that the actual reason Defendants terminated him was to retaliate against his taking FMLA leave.  (Doc. 23, p. 10.)  This allegation might be relevant to Plaintiff's FMLA retaliation claim but, in the context of his ADA claim, it does not constitute evidence that Defendants terminated him because of discriminatory animus.  Nothing in the record

or in Plaintiff's pretext argument suggests that Defendants' actual reason for the termination was to discriminate against Plaintiff's perceived disability in violation of the ADA.  Because Plaintiff has thereby failed to show either that Defendants' proffered reasons for terminating him are false or that the real reason was discriminatory, Plaintiff has failed to meet his burden of establishing pretext.  See Akridge, 93 F.4th at 1196.  Accordingly, Plaintiff's ADA claim cannot survive Defendants' motion for summary judgment under the McDonnell Douglas burden-shifting framework.

**B.    No Convincing Mosaic of Circumstantial Evidence Supporting Plaintiff's ADA Discrimination Claim**

Even though Plaintiff's ADA claim fails the McDonnell Douglas framework, the claim can still survive summary judgment if Plaintiff presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination."  Id. at 1197 (quoting Lewis, 934 F.3d at 1185).  Employees may create this "convincing mosaic" by pointing to, among other things, "(1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn'; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual."  Id. at 1198 (quoting Lewis, 934 F.3d at 1185).  By "jumping directly to the [] question of liability," this alternative standard helps ensure proper summary judgment outcomes despite certain "limits" to the McDonnell Douglas framework.  Tynes v. Fla. Dep't Juv. Just., 88 F.4th 939, 946–47 (11th Cir. 2023).  Both standards, however, address the same "ultimate inquiry in a discrimination lawsuit"—whether there is "enough evidence for a reasonable factfinder to infer intentional discrimination."  Id. (citing Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022)).

Plaintiff's "convincing mosaic" arguments mostly relate to his retaliation claims.  He asserts that there was "suspicious timing" between Defendants' alleged statements about his

FMLA leave, his eligibility for a promotion, and the termination. (Doc. 23, pp. 16–17.) Regarding his ADA claim, as best as the Court can tell, Plaintiff argues that there is a convincing mosaic of evidence showing disability discrimination because Defendants did not engage with him in an "interactive process" regarding a potential accommodation. (Id.)

The Court finds Plaintiff has failed to present a "convincing mosaic" of circumstantial evidence that supports his ADA discrimination claim. As discussed above, Defendants' supposed failure to initiate an "interactive process" is not inconsistent with Defendants' claim that they terminated Plaintiff because of his physical limitations and his violations of Department policy. The lack of such a process—even when considered alongside the timing of Plaintiff's FMLA leave and alleged ineligibility for promotion—would not allow a reasonable factfinder to infer that Defendants intentionally discriminated against Plaintiff's perceived disability. See, e.g., Robinson v. Eisman & Russo, Inc., No. 5:20-cv-157, 2021 WL 5040541, at *2, *3 n.5 (N.D. Fla. Aug. 5, 2021) (no "convincing mosaic" of discrimination even though employer did not engage in interactive process); Moore v. Perficient, Inc., No. 1:20-cv-2124, 2023 WL 11967783, at *7–10 (N.D. Ga. Mar. 31, 2023) (same).

Furthermore, the failure of Plaintiff's "convincing mosaic" argument is made even more clear by the fact that Defendants were not obligated under the ADA to engage in the "interactive process" in the first place. Though the Court assumed Plaintiff established a prima facie case, it is important to note that Plaintiff asserts his ADA claim under a "regarded as" disability theory— asserting he was not actually disabled, but merely perceived as such by Defendants. (Doc. 23, pp. 2–5.) The ADA does not obligate employers to provide any "reasonable accommodation" to employees who are only "regarded as" disabled. 42 U.S.C. § 12201(h) ("[Employers] need not provide a reasonable accommodation . . . to an individual who meets the definition of disability . .

. under subparagraph (C) [on regarded-as disabilities].");  see also Rice v. Guardian Asset Mgmt. Inc., No. 21-13188, 2022 WL 1763816, *1 (11th Cir. June 1, 2022) ("[T]he ADA does not require an employer to provide reasonable accommodations where an employee is only regarded as disabled.")  Thus, Defendants were not required to engage in the interactive process.  Plaintiff therefore has not shown that a convincing mosaic of circumstantial evidence could allow a reasonable jury to infer disability discrimination.  Because Plaintiff's ADA Discrimination claim accordingly cannot survive summary judgment under either applicable theory, the Court **GRANTS** Defendants' Motion for Summary Judgment as to that claim.  (Count I.)

## II.    Retaliation Claims

In addition to his ADA discrimination claim, Plaintiff asserts two causes of action for retaliation: one under Title VII[3] (Count II) and one under the FMLA (Count III).  (Doc. 1, pp. 11–14.)  Both Title VII and the FMLA prohibit employers from retaliating against employees for exercising rights guaranteed under those statutes.  See Smith v. City of Fort Pierce, 565 F. App'x 774, 776–77 (11th Cir. 2014) (Title VII Retaliation); Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 797–98 (11th Cir. 2000) (FMLA Retaliation).  Plaintiff alleges in Count II that Defendants violated Title VII by retaliating against him for complaining about discriminatory treatment.  (Doc. 1, pp. 11–12.)  In Count III, Plaintiff alleges that Defendants violated the FMLA by retaliating against him for taking statutorily protected medical leave.  (Id. at pp. 12–14.)

---

[3]  It is not entirely clear whether Plaintiff intends Count II to assert "Title VII" retaliation or "ADA" retaliation.  Whereas Plaintiff's Complaint labels Count II as a claim for "retaliation under Title VII," (doc. 1, p. 11), his Response to the at-issue Motion describes Count II as an "ADA retaliation" claim, (doc. 23, p. 13.).  Keeping with the Complaint, the Court will address Count II under Title VII.  The Court finds, at any rate, that summary judgment would be warranted against Plaintiff on Count II, regardless.  See Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999) (both Title VII retaliation claims and ADA retaliation claims are reviewed under McDonnell Douglas at summary judgment).

Both of Plaintiff's retaliation claims center on the alleged conversation between Plaintiff and Chief Ballard during Plaintiff's annual performance meeting shortly after his March 23, 2022, return.  (Id. at pp. 6, 11, 13; doc. 23, p. 12.)  According to Plaintiff, Ballard told him that he would not be eligible for an upcoming June 2022 promotion because he "had been out of work multiple times due to medical surgeries."  (Doc. 1, p. 6.)  Plaintiff claims that, in response, he "complained to Chief Ballard that he was being retaliated against for taking protected FMLA leave and he felt as though his medical history and surgeries were being used against him as a reason for him not to be promoted."  (Id.)  Plaintiff argues in Count III that this exchange shows Defendants violated the FMLA by prohibiting him from seeking promotion, and ultimately terminating him, in retaliation for taking protected medical leave.  (Id. at pp. 12–14; doc. 23, p. 12.)  Count II argues that Plaintiff's termination also violated Title VII because, in addition to the medical leave, Defendants terminated Plaintiff to retaliate against his statutorily protected complaints to Ballard. (Doc. 1, pp. 11–12; doc. 23, p. 12.)

Defendants, at the outset, point to Ballard's deposition testimony that he "does not believe th[e] conversation ever happened."  (Doc. 19-1, p. 16; see also doc. 17-8, p. 4.)  Defendants moreover assert that, even if there is a factual dispute whether the conversation took place, there is still insufficient evidence for Plaintiff's retaliation claims to survive summary judgment.  (Doc. 19, p. 25; see also doc. 19-1, p. 16.)  Regarding the corporal position, Defendants argue that Plaintiff's failure to receive the promotion cannot be the basis of a retaliation claim because Plaintiff was terminated on May 25, 2022, and it was known that the position would not become available until the following month.  (Id.)  As to Plaintiff's termination, Defendants again emphasize that the record demonstrates beyond dispute that they believed Plaintiff was physically unfit to be a police officer.  (Doc. 19, p. 25.)  This legitimate, non-retaliatory reason for terminating

Plaintiff, Defendants contend, defeats any claim that the termination was an illegal act of retaliation. (Id.)

Because Plaintiff supports his retaliation claims with only circumstantial evidence,[4] the Court again applies the McDonnell Douglas burden-shifting framework to determine whether the claims survive summary judgment.[5] Lapham v. Walgreen Co., 88 F.4th 879, 889 (11th Cir. 2023) ("[W]hen a plaintiff alleging retaliation presents only circumstantial evidence . . . we apply the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas." (citing McAlpin v. Sneads, 61 F.4th 916, 927 (11th Cir. 2023))). To meet the framework's initial burden of establishing a prima facie case of retaliation, an employee must show that "(1) he engaged in a 'statutorily protected activity'; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." McAlpin, 61 F.4th at 931 (citing Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010)) (referring to FMLA retaliation); see also Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (same standard for Title VII retaliation).

If the employee establishes a prima facie case, the burden of production shifts in essentially the same manner as in the ADA context. The employer must "proffer a legitimate, non-retaliatory reason for the adverse employment action." McAlpin, 61 F.4th at 932 (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). If the employer does so, "[t]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the 'legitimate' reason

---

[4]  Plaintiff concedes in his Response that he "utilizes circumstantial evidence to prove" his retaliation claims, and that the McDonnell Douglas framework therefore applies. (Doc. 23, pp. 11, 13.)

[5]  The Court is not persuaded that analyzing Plaintiff's retaliation claims under a convincing mosaic framework would yield a different result. At any rate, the Eleventh Circuit has "yet to decide in a published decision whether retaliation claims can survive summary judgment under a convincing-mosaic theory." Reyes v. Fed. Express Corp., No. 21-12639, 2022 WL 3867901, *4 n. 2 (11th Cir. Aug. 30, 2022).

is merely pretext for prohibited, retaliatory conduct." Id. at 927 (quoting Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000)).  Here, although one of Plaintiff's theories passes the first step of McDonnell Douglas, his retaliation claims cannot survive summary judgment because he again fails to show that Defendants' legitimate reasons for terminating him—his physical limitations and policy violations—were pretext.

### A.    Plaintiff's Prima Facie Retaliation Case

The Court finds Plaintiff has established a prima facie case on both his FMLA and Title VII retaliation claims—but only to the extent those claims arise from Plaintiff's termination. Plaintiff's claim that Defendants terminated him as an illegal act of retaliation satisfies the three requirements for a prima facie case.  On the other hand, Plaintiff's purported ineligibility for promotion cannot be the basis of a prima facie retaliation case because Ballard's alleged comments regarding the promotion are not an "adverse employment action."

First, all of Plaintiff's retaliation claims satisfy the initial step of a prima facie case because the record contains sufficient evidence to show that Plaintiff engaged in statutorily protected activity.  Regarding Count III, the parties agree that Plaintiff took FMLA-protected medical leave on two occasions: from August 19, 2020, to January 20, 2021; and from December 26, 2021, to March 23, 2022.  (Doc. 24, pp. 1–2.)  As to Count II, Plaintiff argues that his alleged complaints to Ballard about the corporal promotion constitute a Title VII-protected act of "opposing illegal activity."  (Doc. 1, p. 11.)  See Smith, 565 F. App'x at 777 ("Under Title VII, an employee has engaged in protected activity if she has . . . opposed an unlawful employment practice." (citing EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000))); see also 42 U.S.C. § 2000e-3(a).  Although Defendants deny that this conversation took place, Plaintiff's allegations to

the contrary create a material dispute on that issue.[6]  Accordingly, there is enough evidence of statutorily protected expression to support both of Plaintiff's retaliation claims.

Only one of Plaintiff's two retaliation theories, however, satisfies the second step of a prima facie case, which requires that Plaintiff suffer an "adverse employment action."  To demonstrate an adverse employment action, a plaintiff must show that his employer altered "an identifiable term or condition of employment" in a manner that caused the plaintiff to suffer at least "some harm."  Muldrow v. City of St. Louis, 601 U.S. 346, 354–55 (2024).  Here, Plaintiff asserts that "there are two relevant adverse employment actions taken by Defendants against [him]: prohibiting [him] from seeking a promotion and terminating [his] employment on May 25, 2022." (Doc. 23, p. 12.)  Plaintiff's May 25 termination was clearly an adverse employment action.  See Griffith v. Nicholas Fin., Inc., 214 F. Supp. 3d 1215, 1225 (N.D. Ala. 2016) ("The termination of a person's employment is the classic and ultimate tangible employment action.") (quotations omitted).  The alleged prohibition on Plaintiff's promotion, however, is a different matter.  To be sure, Plaintiff has created a factual dispute as to whether Ballard told him that he was ineligible for the June 2022 promotion.  However, even assuming that this conversation occurred, Ballard's alleged statements are not an "adverse employment action" upon which Plaintiff can base his retaliation claims.

_____

[6] Indeed—even though the Court finds Ballard's alleged comments on the promotion were not an "adverse employment action"—there is still a dispute of fact whether Plaintiff opposed illegal activity for purposes of 42 U.S.C. § 2000e-3(a).  The Eleventh Circuit has established that, to constitute protected activity under § 2000e-3(a), an employee's complaint need only be based on "a 'good faith reasonable belief' that [his] employer was engaged in unlawful discrimination."  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)); see also Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010) (complaining employee must show they "subjectively believed that [their employer] engaged in unlawful discrimination).  As evidenced by Plaintiff's arguments regarding the promotion, there is at least a dispute of fact regarding whether he believed Ballard's comments were unlawfully discriminatory.

While an adverse employment action does not need to be "significant" or "serious," a plaintiff still "must show some harm respecting an identifiable term or condition of employment." Lukie v. MetLife Grp., Inc., No. 22-10967, 2024 WL 4471109, *5 (11th Cir. Oct. 11, 2024) (citing Muldrow, 601 U.S. at 350, 353–54); Muldrow, 601 U.S. at 350, 354–55. This means employees cannot establish an adverse employment action merely by alleging that their employer *would have* taken harmful action in a hypothetical scenario.  See, e.g., Zienni v. Mercedes Benz U.S. Int'l, Inc., No.7:23-cv-01002-LSC, 2024 WL 4829484, *6 (N.D. Ala. Nov. 19, 2024) (citing Muldrow, 601 U.S. at 354–55) (employer's testimony that "she *would have* informed HR if she caught [the plaintiff] praying," which "could have" subjected the plaintiff to discipline, was not an adverse employment action because "these hypothetical actions did not occur and thus caused no actual harm to an 'identifiable term or condition' of [the plaintiff's] employment")  Cases addressing a discriminatory failure to promote confirm that this rule extends to the facts at issue here.  Indeed, to state a prima facie claim in that context, employees must show that they were qualified for a promotion, applied for it, and were rejected by their employer.  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005) (citing McDonnell Douglas Corp., 411 U.S. at 802); see also Keane v. Fed. Express Corp., 738 F. App'x 1007, 1010 (11th Cir. 2018); Shine v. Bd. Trus. Univ. Alabama, No. 2:18-CV-2093-CLM, 2021 WL 6197813, at *5 (N.D. Ala. Dec. 30, 2021).

Plaintiff's allegation is that, around the time of his March 23, 2022, return, Ballard told him that if he applied for the June 2022 corporal promotion, his application would be rejected. (Doc. 1, p. 6.)  It is undisputed, however, that Plaintiff never had the opportunity to apply for this promotion because Defendants terminated him on May 25, before the application became available in June.  (Id. at p. 8.)  Ballard's alleged statements about whether he would promote Plaintiff in the future accordingly did not have the effect of changing an "identifiable term or condition of

[Plaintiff's] employment," nor did they cause Plaintiff any cognizable "harm" or leave him "worse off." Muldrow, 601 U.S. at 354–55, 359. Indeed, rather than showing Defendants actually prevented Plaintiff from being promoted, the allegation amounts to mere speculation by Plaintiff that *if* he had applied for the corporal position, Defendants *would have* rejected him. This is not an adverse employment action. See, e.g., Zienni, 2024 WL 4829484, at *6.

Failure-to-promote cases reinforce the Court's conclusion. Plaintiff has not alleged that he was qualified for the corporal promotion, that he applied for the promotion, or that Defendants rejected him. See Vessels, 408 F.3d at 768; see also Collins v. Atlas Roofing Corp. of Miss., No. 1:22-cv-00916, 2023 WL 11915693, at *4–7 (N.D. Ga. Apr. 7, 2023) (no *prima facie* failure-to-promote case when plaintiff failed to allege either that he applied for or was qualified for promotion); Ingram v. Kellogg Sales Co., No. 109-021, 2011 WL 132850, at *4 (S.D. Ga. Feb. 23, 2011) (no *prima facie* failure-to-promote case when plaintiff did not allege she applied for promotion). The Court therefore finds that, while Plaintiff's May 25 termination is an adverse employment action, the alleged prohibition on Plaintiff's promotion to corporal is not. Plaintiff has thereby only stated a prima facie retaliation case to the extent his claims arise from the termination. Moving forward in the McDonnell Douglas framework, the Court will accordingly disregard the promotion-related claim and will only consider whether Defendants violated the retaliation provisions of the FMLA and Title VII by terminating Plaintiff.

As to the final element of the prima facie case—causation—Plaintiff has shown that there is "some causal relation" between his termination on the one hand and his FMLA leave and Title VII-protected complaints on the other. The causal showing a plaintiff must make for a prima facie case is less demanding than the separate "but for" standard that will apply at the "pretext" step. Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1294 (11th Cir. 2021); see also

Criag v. City of Mobile, No. 1:23-cv-00269-KD-M, 2024 WL 4905630, *20 (S.D. Ala. Nov. 27, 2024).  At this stage, Plaintiff need only show that: "(1) the decisionmakers knew of his protected activity; and (2) the protected activity and adverse action were not wholly unrelated."  Harris v. Fla. Agency for Health Care Admin., 611 F. App'x 949, 951 (11th Cir. 2015) (citing Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002)).

Plaintiff, first, has at least created a dispute whether Defendants "knew of" his alleged protected activity.  As detailed already, Defendants concede that they were aware Plaintiff left on FMLA leave in August 2020 and in December 2021.  (Doc. 24, pp. 1–2.)  As to Plaintiff's Title VII complaints, the Court has explained that there is a dispute of fact as to whether Plaintiff voiced those complaints to Ballard.  It follows that a dispute also exists whether Ballard and, by extension, Defendants, heard and thereby "knew of" Plaintiff's Title VII-protected complaints.

Second, the Court assumes, without deciding, that Plaintiff has made a sufficient showing that his protected acts were "not wholly unrelated" to his May 25 termination.  To show at the prima facie stage that events were "not wholly unrelated," it is usually enough that a plaintiff demonstrates "a close temporal proximity between the protected conduct and the adverse action."  Harris, 611 F. App'x at 951 (citing Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006)).  Here, Plaintiff took protected FMLA leave until his return to work on March 23, 2022, and allegedly lodged his Title VII-protected complaints "within a week" of that return.  (Doc. 1, p. 6.)  Defendants' termination of Plaintiff on May 25, 2022, therefore occurred roughly two months after Plaintiff's protected activities.  While it is not entirely clear that this temporal proximity is close enough to satisfy the "not wholly unrelated" requirement, cf. Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[A] three-month proximity between the protected conduct and the adverse action does not create a jury issue about the causal connection between

them."), the Court will assume without deciding that Plaintiff's FMLA and Title VII retaliation claims satisfy the final requirement of a prima facie case. The Court finds, at any rate, that the claims fail under the subsequent steps of <u>McDonnell Douglas</u>.

**B.    Defendants' Legitimate, Non-retaliatory Reasons for Terminating Plaintiff and Pretext**

Because Plaintiff has established a prima facie case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for their termination of Plaintiff. <u>McAlpin</u>, 61 F.4th at 932. To meet this burden of production, Defendants again assert that they terminated Plaintiff because they believed he was physically unable to perform the duties of a police officer, and that he had violated Department policy by returning to duty in his limited state. (Doc. 19, p. 25.) For the same reasons explained above in the context of Plaintiff's discrimination claim, this explanation satisfies Defendants' light burden. <u>See</u> <u>Todd</u>, 998 F.3d at 1219 (single explanation for adverse employment action satisfied employer's "legitimate reason" burden as to both discrimination and retaliation claims). The burden accordingly shifts back to Plaintiff, who must create a genuine dispute of fact that Defendants' proffered reasons are pretext for retaliation. <u>McAlpin</u>, 61 F.4th at 927.

The Court finds Plaintiff has failed to show pretext because, considering Defendants' legitimate reasons, there is insufficient evidence that FMLA or Title VII retaliation was a "but-for" cause of Plaintiff's termination. As in discrimination cases, to establish at summary judgment that an employer's proffered reason is pretext for illegal retaliation, a plaintiff must show "both that the reason was false, and that [retaliation] was the real reason." <u>Gogel v. Kia Motors Mfg. Ga., Inc.</u>, 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007)). Even though "[a plaintiff's] temporal-proximity arguments may be enough to establish a prima facie case of retaliation, temporal proximity by

itself generally cannot prove that an employer's proffered reasons are pretextual." Todd, 998 F.3d at 1219–10 (citing Gogel, 967 F.3d at 1137 n.15). The Eleventh Circuit has instead established that, "[a]t the stage of summary judgment proceedings in which the plaintiff must rebut the defendant's proffered nonretaliatory reason for its action, . . . the plaintiff must meet the more demanding 'but for' test." Tolar, 997 F.3d at 1294; see also Gogel, 967 F.3d at 1135 n.13 ("We and other circuit courts have integrated this but-for standard into our summary judgment analysis."). This requires an employee to show that, despite his employer's proffered reason, "one could reasonably infer that but for [his] protected conduct the employer would not have taken the alleged adverse action." Tolar, 997 F.3d at 1294. Here, Plaintiff has not made this showing.

The Court already explained above that Plaintiff has failed to show Defendants' proffered reasons for terminating him—their belief that he was physically unable to perform and had violated Department policy—are "false." This finding remains true in the retaliation context. Even if Ballard told Plaintiff his FMLA leave barred him from promotion and Plaintiff responded with Title VII-protected complaints, Plaintiff still has not shown that Defendants did not honestly believe he was physically unable to be a police officer. See Thomas, 645 F. App'x at 951 ("A stray comment by a supervisor that is unrelated to the employment decision will usually not be sufficient to show pretext absent some additional evidence supporting a finding of pretext." (citing Scott v. Suncoast Beverage Sales, Inc., 295 F.3d 1223, 1229 (11th Cir. 2002))).

Furthermore, Plaintiff has not shown that, "but for" his protected conduct, he would not have been terminated. The but-for causation test "directs us to change one thing at a time and see if the outcome changes." Lapham, 88 F.4th at 894 (quoting Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020)). If the outcome changes, "the isolated factor is a but-for cause. And if it does not, the isolated factor is not a but-for cause." Id. (citing Bostock, 590 U.S. at 656). The Court

finds that Plaintiff's retaliatory pretext argument fails this test.  Changing the fact that Plaintiff took FMLA leave and made Title VII-protected complaints would not change his ultimate termination.  That is, even if Plaintiff had not engaged in that conduct, Defendants still would have terminated him based on their belief that he was physically unable to perform his job, and that he had violated Department policy in the process.  Because Plaintiff has therefore failed to show Defendants' proffered reasons for terminating him are pretext for retaliation, the Court **GRANTS** Defendants' Motion for Summary Judgment as to both of Plaintiff's retaliation claims (Counts II & III).

## CONCLUSION

In sum, Plaintiff has failed to raise a genuine issue of material fact that his employment was terminated because of his perceived disability, or because he engaged in conduct protected under the ADA, Title VII, or the FMLA.  The Court accordingly **GRANTS** Defendants' Motion for Summary Judgment on all counts.  (Doc. 17.)  With no further claims remaining, the Court **DIRECTS** the Clerk of Court to **ENTER** the appropriate judgment and to **CLOSE** this case.

**SO ORDERED**, this 24th day of February, 2025.

_____
R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA